LELIA SAPP, by next friend, Respondent, v. W. C. HUNTER, Appellant.

Kansas City Court of Appeals, January 11, 1909.

1. **AUTOMOBILES: Common Law: Statute: Frightening Horses: Burden of Proof.** Under the common law and statute automobiles are lawful vehicles and to entitle plaintiff to recover against the owner of one for personal injury resulting from the frightening of his team, he must plead and prove that some act or acts of negligence in the operation of the machine were the approximate cause of the injury.

2. ———: **Negligence: Instruction: Appellate Practice.** While an appellate court should condemn instructions that are ambiguous or misleading in a way to permit the jury to reasonably entertain an erroneous and prejudicial view of the law of the case, it has no right to assume that the jury might be misled by a possible but forced and unnatural interpretation of the language used; and a series of instructions set out in the opinion relating to the question of the respective rights and duties of a chauffeur and the driver of a team are held not to be misleading and certain interpretations thereof are held forced and unnatural.

3. ———: ———: **Frightening Horses: Evidence.** The evidence relating to the conduct of a chauffeur in running his machine is held sufficient to send the question of negligence to the jury.

Sapp v. Hunter.

4. ———: ———: ———: ———: **Stopping Motor.** The question of a chauffeur's negligence under the evidence in not stopping his motor is properly sent to the jury, notwithstanding it is the law that the chauffeur is not compelled to stop his motor in all situations where horses drawing vehicles exhibit signs of fright, since in some conditions it might be dangerous to himself or those under his care; but his failure to stop the noise where it could be reasonably done is negligence.

Appeal from Grundy Circuit Court.—*Hon. George W. Wanamaker*, Judge.

AFFIRMED.

O. G. *Bain & Son* and A. G. *Knight*, for appellant, filed argument.

E. M. *Harber* and *Hubbell Bros.* for respondent.

(1) The defendant negligently failed to keep a vigilant watch for plaintiff's mother and this team. (2) The defendant negligently ran this automobile at an excessive rate of speed. Acts 1903, sec. 2, pp. 162, 163. (3) The defendant negligently failed to stop this automobile soon enough to prevent frightening these horses. (4) The defendant negligently permitted this automobile to continue making an unnecessary and horse frightening noise. Hall v. Compton, 108 S. W. 1124. (5) Among other authorities supporting the plaintiff's fourth, fifth and sixth instructions are the following: Springs Co. v. Brown, 1 L. R. A. (N. S.) 241; Springs Co. v. Brown, 74 N. E. 615; Shinkle v. McCullough, 77 S. W. 197; Shinkle v. McCullough, 105 Am. St. Rep. 249; Christy v. Elliott, 216 Ill. 31; Christy v. Elliott, 74 N. E. 1035; Christy v. Elliott, 1 L. R. A. (N. S.) 215; McFern v. Gardner, 121 Mo. App. 1; Sess. Acts, 1903, p. 162; Murphy v. Wait, 92 N. Y. S. 254; Knight v. Lanier, 74 N. Y. S. 999; The Westhall, 153 Fed. 1014.

JOHNSON, J.—Lelia Sapp, an infant six years old and the only child of Minnie Sapp, deceased, brought this suit in October, 1906, to recover damages on the ground that the death of her mother (who was an unmarried woman) was caused by the negligence of defendant in operating an automobile on a public street in Trenton. Trial in the circuit court resulted in a judgment for plaintiff for two thousand dollars and the cause is here on the appeal of defendant.

Early in the afternoon of a day in August, 1906, Peter Sapp, a farmer, accompanied by his daughter, Minnie (the mother of plaintiff), drove to Trenton in an ordinary farm wagon, drawn by a team of horses. He drove west on College avenue, a public street, and stopped to sell a sack of corn at Cook's mill, which stands on the southwest corner of College avenue and Washington street. The streets in this part of the city do not run with the cardinal points of the compass, but for convenience, we shall speak of College avenue as though its course were east and west and of Washington street as running north and south. St. Louis street is the next east and west thoroughfare south of College avenue, and the intervening block is two hundred feet long. The north wall of the mill is three feet from the south property line of College avenue, and the west wall, for a distance of forty feet from the corner is eight feet from the east line of Washington street. A platform four feet, five inches high and five feet, nine inches wide is in this space next to the building. Forty feet from the corner of the building the west wall, which extends back of that point thirty-nine feet, is built five feet closer to the property line. Sixty-six feet south of the street corner are the mill wagon scales which extend into the street nine feet. A telephone pole stands six and one-half feet west and five feet nine inches north of the northwest corner of the mill. The team and wagon stopped and stood on the south side of College avenue close to the mill, and were

headed west. There is a sharp conflict between the witnesses over where the horses stood with reference to the telephone pole. Some, introduced by plaintiff, say the heads of the horses were four or five feet west of the pole while witnesses for defendant say their heads barely extended to the pole. If the witnesses for plaintiff are right, it is apparent from all the testimony as well as from the plats and photographs in evidence that the horses and occupant of the seat in the wagon were plainly visible to defendant from the time he turned his automobile from St. Louis street into Washington street and proceeded north along the traveled roadway of the latter thoroughfare. But, if defendant's witnesses correctly describe the position of the team, it was not visible from St. Louis street because of the obstruction to vision offered by the mill platform, nor could the occupant of the wagon be seen since that position would place her behind the mill building. When he stopped, Mr. Sapp alighted from the wagon and carried the sack of corn into the mill. His daughter remained in the wagon and held the lines. The mill was running and was making a noise and there is evidence to the effect that the team showed some signs of uneasiness, but plaintiff's evidence strongly tends to show that the horses were gentle and that the young woman was in the habit of driving them. Defendant, driving a two-seated gasoline motor car, came west on St. Louis street, turned into Washington street and drove north towards the team. The horses became frightened at the machine, backed behind the mill until they turned the wagon and then dashed eastward on College avenue. The unfortunate woman entirely lost control of the animals and was thrown from the wagon, sustaining injuries from which she died next morning.

Defendant testified that on account of an up-grade at the crossing at St. Louis and Washington streets, he changed his machine to the low gear at the ascent and ran on that gear down Washington street which,

from the crossing, is on a slightly descending grade. He was keeping a vigilant lookout and could not see the team until after he left the crossing. As he proceeded, he saw the heads and necks of the horses between the telephone pole and the corner of the building. At first, they gave no indication of fright, and he came on traveling at the rate of four or five miles per hour until he reached a point opposite the mill scales. Suddenly and without previous warning, the horses became frightened and backed out of sight behind .the building. At the first appearance of fright, defendant began to stop his vehicle and succeeded in bringing it to a full stop in three or four feet. He also stopped the motor and held the car stationary and silent opposite the scales a minute or two. Thinking the danger over, he alighted, "cranked up" the machine, re-entered the car and drove on. He turned west on College avenue and at the corner looked eastward. The team had disappeared but many people were in the street. He did not stop to ascertain what had become of the team and occupant of the wagon and did not learn of the injury to the mother of plaintiff until late that evening. Defendant is contradicted in vital particulars by the witnesses of plaintiff and by some of his own witnesses. Peter Sapp testified that the car did not stop at all, but ran on to College avenue without abatement of speed, but the testimony of all the other eye-witnesses is against him on this point and we think the admitted physical facts demonstrate that he must be mistaken.

For the purposes of our discussion, we shall assume that the car was stopped at the scales some sixty-five feet from where the horses had been standing. Without lengthening the opinion with quotations from the testimony of the witnesses, we find the evidence most favorable to plaintiff strongly · tends to establish the existence of the following facts: First, the horses

134 App.—44

were standing where defendant might have seen them and the occupant of the wagon when first he turned into Washington street. Second, he ran down the street at the rate of fifteen miles per hour with his machine headed towards the horses and without giving warning. Third, he did not begin to reduce speed at the first appearance of excitement in the horses and did not attempt to stop his machine until panic seized them. Fourth, he did not stop his engine and it continued to make loud noises while the car was standing at the scales. All these things are pleaded in the petition as the negligence on which plaintiff predicates her right to recover.

The answer contains a general denial and a plea of contributory negligence on the part of Minnie Sapp. At the close of the evidence, the court refused to give the peremptory instruction asked by defendant and, at the request of plaintiff, instructed the jury in part as follows:

IV.   "The court instructs the jury that while the defendant and the automobile had an equal right to the street and road with the deceased, Minnie Sapp, and the horses and wagon, the law required that in the use and operation of the automobile, the defendant exercise reasonable care corresponding to the risk of injury to Minnie Sapp, and others on the public highway, and, it was the further legal duty of the defendant to keep vigilant watch for vehicles, carriages or wagons drawn by animals and especially vehicles, carriages or wagons driven by women and children, and, if necessary to prevent injury or death by the frightening of such animal or animals, to bring said automobile to a stop in order to give such driver or person an opportunity to alight from such vehicle, or an opportunity to take such other reasonable action as might be necessary for safety.

"A failure to perform the aforesaid duties is negligence as a matter of law.

"Therefore, if the jury believes from the evidence that the deceased, Minnie Sapp, was the mother of plaintiff, Lelia Sapp; and, that on August 8, 1906, at Trenton, Grundy county, Missouri, Minnie Sapp had driven a team and wagon up to Cook's mill, and had stopped there holding said horses while her father went in to the mill to sell a sack of corn and that the defendant, then and there, approached said team with an automobile; and, that defendant, then and there, negligently failed to keep a vigilant watch for plaintiff's mother and said team, or negligently ran and operated said automobile at an excessive rate of speed, *or, negligently failed to stop said automobile soon enough to prevent frightening said horses, or, negligently permitted said automobile to continue making an unnecessary and horse frightening noise, and,* that either, or all of said acts of defendant caused the runaway of said horses and killing of plaintiff's mother, and that she was then and there in the exercise of ordinary care on her part, then the plaintiff is entitled to recover and the jury must find for the plaintiff."

V. "Under the law it was the legal duty of the defendant, at all times while operating his automobile upon the public streets, roads or highways of this State to keep a vigilant watch for vehicles drawn by animals and especially to keep a vigilant watch while so operating his automobile upon the streets of the city of Trenton, for vehicles, carriages or wagons driven by, and in charge of women or children; and, if the jury believe from the evidence that defendant, by the exercise of such vigilant watch and observation, could have seen and observed the team the deceased was driving and in charge of, and could have stopped said automobile and the noise thereof in time to have prevented the injury and death of Minnie Sapp; and, that defendant negligently failed to keep such vigilant watch; and that, by reason of such failure to keep such

vigilant watch, the horses were frightened and ran away and killed Minnie Sapp, while she was in the exercise of ordinary care, then the defendant is liable and the jury should so find.

"And, in this connection the court says to the jury that even if the jury should believe from the evidence that the defendant stopped his automobile, and even the noise thereof, when or as soon as he became aware of the condition, situation or fright of said team, this alone would not excuse him in law. *But, if he, by the keeping of a vigilant watch, might have seen and observed said team and its condition prior to the time he did so observe the same, and prior to the time he did so stop, if he did stop said automobile and its noise, then, it was his duty to have so seen said team, and a failure to keep such vigilant watch would be negligence."*

VI. "It was the duty of the defendant to know the law and the legal rate at which he could operate and run his automobile in the city of Trenton and upon the highways of Grundy county. And under the law the defendant had no right to run the automobile upon such streets or highways, at a greater rate of speed than nine miles per hour. And this he was conclusively presumed to have known.

"And if the jury believes from the evidence that the defendant ran the automobile at a greater rate of speed than nine miles per hour at the time and place of the injury and death of Minnie Sapp, whether he knew the same was in violation of the law or not, then this constituted and was, negligence as a matter of law."

VII. "If the jury believe from the evidence that, at the time, place and under the circumstances of her injury and death, Minnie Sapp exercised ordinary care —that is, such care as an ordinarily prudent person

would exercise under like circumstances, then, she was not guilty of contributory negligence and the jury would not be warranted in finding against the plaintiff on that ground.

"The burden of proof is on the defendant to show by the greater weight of all evidence that Minnie Sapp was not exercising ordinary care, and that such failure to exercise ordinary care directly contributed to her injury and death and unless the defendants have so proved such facts, you cannot find for the defendant on the defense of contributory negligence."

We have italicized the portions of the instructions criticized by defendant in his brief and argument. He does not insist that his demurrer to the evidence should have been sustained and for reasons we shall state in the discussion of the instructions, we think the evidence justified the submission to the jury as issues of fact all of the negligent acts pleaded in the petition.

The first objection to the fourth instruction argued by defendant is that, in the part italicized, defendant was burdened with the duty of operating his automobile in a manner to avoid frightening horses rightfully in the public highways. In other words, it is contended that in the clause "or negligently failed to stop said automobile soon enough to prevent frightening said horses," the jury were told, in effect, that regardless of the degree of care defendant might have been exercising at the time, the bare fact that the approach of his machine did frighten the horses and cause them to run away and kill the mother of plaintiff is proof of negligence on the part of defendant which will support the cause of action asserted. Should we adopt this construction of the language under consideration, we would feel compelled to pronounce the instruction erroneous. A person driving a motor car on a public thoroughfare is not an insurer of the safety of the occupants of vehicles drawn by horses. In meeting or passing such vehicles, he must employ care in keeping

with the demands of the circumstances of the situation, which means that he must not run at an excessive rate of speed, must keep a vigilant watch and at the first indication of danger, must stop his vehicle and, if necessary and practicable, must stop his motor. If, despite his observance of such reasonable caution and regard for the rights of others, horses suddenly become so frightened and unruly that they injure an occupant of the conveyance to which they are hitched, the autoist cannot be held liable to respond in damages for such injurious consequences. Under the principles and rules of the common law, automobiles should be recognized as lawful vehicles, and there is nothing in the statutes enacted in 1903 (sections 1 and 2, p. 162) to alter their character. To entitle her to recover, it devolved on plaintiff to plead and prove that some act or acts of negligence on the part of defendant in the operation of the machine were the proximate cause of the injury. [Hall v. Compton, 130 Mo. App. 675; O'Donnell v. O'Neill, 130 Mo. App. 360.]

We think the instructions given at the request of plaintiff, when considered together as a single charge, conform to the view of the law just expressed. In order to find for plaintiff, on account of defendant's failure to stop his automobile "soon enough to prevent frightening said horses," the jury were required to find, not only that such act was the proximate cause of the injury, but also that it was negligently performed. The use of the word "negligently" referred the jury to the duty of defendant to stop as defined in the instructions, and the definition given required defendant to maintain a vigilant watch and to stop at the appearance of danger. We think it would be a strained construction to say that the instructions charged defendant with liability on the mere finding by the jury that the horses were frightened by the automobile. While it is our duty to condemn instructions that are ambiguous or misleading in a way to permit the jury reasonably to

entertain an erroneous and prejudicial view of the law of the case, it is not our duty to assume that the jury might be misled by a possible but forced and unnatural interpretation of language used. The rule of law was properly stated and was applicable to facts in evidence. We have conceded that defendant did stop at or near the scales but the evidence of plaintiff presented as a vital issue the question of whether he began to stop as soon as the appearance of the team indicated that it was dangerous for him to proceed. There is room for a reasonable inference that he did not start to check speed at that time nor until the injury had become unavoidable. If this be true, his conduct was negligence which stands out as a proximate cause of the injury, since the fact is indisputable that the fright of the team was caused by the appearance of the automobile.

The next objection urged against the instructions is that they directed a verdict against defendant on the hypothesis that if defendant failed to discontinue the noise of his machine by stopping the motor and if the continuation of such noise was unnecessary and operated to intensify the fright of the horses and thereby to cause them to run away, such act should be considered negligence directly contributing to the production of the injury. The evidence shows, and, indeed, it is a matter of common knowledge that automobiles run by gasoline motors continue to make a whirring, grinding, nerve-racking noise, after the car is stopped. Knowing, as he did, that the horses had backed in fright behind the mill, we are of opinion defendant should have known that to continue the noise might, and probably would, increase the terror of the animals to the point of making them unmanageable and, as it was in his power to stop the noise immediately, the question of whether his failure to stop it was negligence, was one of fact to be solved by the jury. We agree with the Supreme Court of Minne-

sota (Mahoney v. Maxfield, 113 N. W. 904), that neither by the rules of the common law nor by those prescribed by statute, is it made the duty of the chauffeur of a motor car to stop his motor in all situations where horses drawing vehicles exhibit signs of fright. If the machine is approaching a frightened animal on a steep grade, it might be highly dangerous to the occupants of the car to stop the motor. Where a person is compelled to choose between protecting himself and those in his charge against possible injury, or protecting others who are in peril, he is justified in obeying the instinct of self-preservation. But, all of the evidence, including the testimony of defendant, demonstrates beyond question that the noise of the motor could have been stopped without the slightest danger to defendant or his companion. With this fact conceded, and with the further fact apparent that the horses were frightened at the machine, it was the absolute duty of defendant, not only to stop the forward motion of the car, but also to discontinue the noise.

Other objections to the instructions are too clearly without merit to call for notice. The record discloses that the trial was free from prejudicial error and that the judgment is for the right party. Affirmed. All concur.